## Scranton City School Directors.

*School law—Removal of directors—Violations of Code of May 18, 1911—Tax collectors—Treasurer—Misconduct of officials.*

1. The court cannot remove school directors for every act of negligence or carelessness of which they may be guilty, but only for neglect of those duties which, by the Code of May 18, 1911, P. L. 309, are made mandatory.

2. There can be no such thing as an implied mandatory duty. A duty commanded must be a duty expressed.

3. The mere fact that the school board appointed a treasurer and in a general way had supervision over him, does not in itself make the board chargeable, in removal proceedings, with the delinquencies of such treasurer.

4. The proceedings for the removal of school directors are penal in character, and the rights of the directors must be as carefully considered as are the rights of a defendant in a criminal court.

5. The failure of school directors to require the tax collector to make a written report to the secretary of the board at the end of each month of all taxes collected and the failure to require the collector to pay the taxes collected during the month to the treasurer, are not grounds for removing the directors.

6. The reappointment of a tax collector to collect taxes for the succeeding year, without having first required him to settle his duplicate in full for the preceding year, he having been exonerated from taxes he had been unable to collect, is not ground for the removal of the directors, and this is especially so where it appears that no loss thereby accrued to the school district and that the liability of the taxpayers to pay the taxes was not affected.

7. To hold that a school board has not wide discretion in exonerating a collector from the collection of taxes in the duplicate by the end of the school year would be equivalent to holding that no school tax collector could ever be reappointed to succeed himself.

8. There is nothing in the Act of May 18, 1911, P. L. 309, which commands the school directors to investigate personally the case of every delinquent taxpayer.

9. It is no ground for removing school directors that a tax collector converted to his own use sums of money which represented interest on deposits of school moneys in banks, where there is no evidence whatever that the directors knew that he had made such a profit.

10. School directors will not be removed because the treasurer of the school district, although making reports to the directors from time to time of moneys received, did not comply strictly with the Code by making a report at the end of each month.

11. It is no ground for removing school directors that they entered into contracts for the payment of small sums of money without strictly complying with section 403 of the School Code, if it appears that such violations were merely technical and did not result in any loss to the school district.

Petition for removal of school directors. C. P. Lackawanna Co., Oct. T., 1924, No. 806.

*Harold A. Scragg*, District Attorney, *R. P. Silverstein* and *J. B. Jenkins*, Assistant District Attorneys, for petitioners.

*R. H. Patterson, M. J. Martin, William S. Diehl, John P. Kelly, William R. Lewis, Clarence Balentine* and *Joseph F. Gunster*, for respondents.

MAXEY, J., Nov. 25, 1924.—This is a proceeding to remove the school directors of the City of Scranton, a school district of the second class. Our entire power to do the thing asked of us is created and limited by section 217 of the School Code of May 18, 1911, P. L. 309, which provides that if a board of school directors in any district shall fail to organize or refuse or neglect to perform any duty imposed upon it by the provisions of the School Code, and after a petition has been duly presented to the court by ten resident taxpayers, specifying the neglect of duty, and after due hearing upon the charges, that then, if "the court shall be of the opinion that any duty imposed on said board

of school directors, which is by the provisions of this act made mandatory upon them to perform, has not been done or has been neglected by them, the court shall have the power to remove said board or such of its number as in its opinion is proper, and appoint for the unexpired terms other qualified persons in their stead."

*Preliminary discussion.*

Nothing is clearer than the fact that the court cannot remove school directors for every act of negligence or carelessness of which they may be guilty, but only for neglect of those duties which by the Code are made mandatory, that is, for neglect of those duties the Code expressly commands them to perform. There can be no such thing as an implied mandatory duty. A duty commanded must be a duty expressed.

The School Code clearly creates and defines the duties of not only the school board itself, but also of the president, the secretary, the treasurer, the tax collector, the district superintendent and, until June 29, 1923, two auditors. It also provides for the appointment of a solicitor. The duties commanded by law of the board of directors and of the various officers, only one of whom, that is, the president, is even a member of the board, are as distinct as the duties commanded by law of the President of the United States, the members of the President's cabinet, the United States Treasurer and the Collector of Internal Revenue. It is as illogical and as illegal to attempt to remove the school directors for some neglect of duty on the part of the treasurer or collector of taxes as it would be to impeach and attempt to remove the President of the United States from office should the United States Treasurer embezzle public funds, or should the Collector of Internal Revenue receive to his personal profit interest earned on taxes collected. The mere fact that the school board appointed a treasurer and in a general way had supervision over him does not in itself make the board chargeable in a proceeding of this kind with the delinquencies of the treasurer, any more than the fact that the President of the United States appoints the United States Treasurer and in a general way has supervision over his work makes the President answerable to the United States Senate, sitting as a court of impeachment, for any shortcomings of the United States Treasurer. The President of the United States can be removed from office only for breach of some duty commanded of him by the Constitution and the laws; and, likewise, the board of school directors of the City of Scranton can be removed by this court only for neglect of a legal duty which, by the provisions of the School Code, is "made mandatory upon them to perform."

No man can be brought before the bar of justice to answer for a crime unless the crime charged is clearly set forth in an indictment. If the indictment sets forth some offending act which is not by law characterized as a crime, the alleged offender need not even plead to the indictment, but may demur to it; that is, he may declare, in effect: "I plead neither guilty nor not guilty, but I abide in the law, for the law does not make the act charged against me a crime." The Scranton school directors, while not brought before the bar of justice to answer for a crime, are, nevertheless, brought before the court to answer charges of neglect of duty; and if the duty or duties whose neglect is charged are mandatory duties under the Code, and if the charges are sustained, they may suffer removal from office, which also carries with it five years of ineligibility for the same office. So the proceedings before us are penal in character and effect, and the rights of the respondents must be as carefully conserved as are the rights of a defendant in a criminal court.

*The alleged breaches of duty.*

What are the breaches of duty alleged against the respondents? Are the duties whose breach is charged duties such as the School Code commands the directors to perform; that is, are they mandatory duties? If they are not, we have no power to remove these directors. If they are mandatory duties, have these breaches been sufficiently proved; and, if proved, are they of such a grave character as would justify the court in exercising its power to remove the directors? The law does not command the court to remove directors for breach of even mandatory duties. It merely gives the court "the power" to do so—a power to be exercised in the court's own discretion.

*First alleged breach of duty.*

The petition to remove the directors sets forth:

"First. That the directors neglected to require the tax collector of the district to make a written report to the secretary of the board of school directors at the end of each month of all taxes collected by him during the said month, furnishing the names of the taxables from whom the same have been collected, in direct violation of section 553 of the School Code."

We turn to the Code and we find neither in section 553 nor elsewhere a single word commanding the school directors to require the tax collector to make such a report. The collector is commanded to do so, but the board is not commanded to make him do so, or, upon his failure to do so, to dismiss him. There are thousands of public officials, such as heads of bureaus in Washington, ambassadors and consuls and army and navy officers, whose duty it is to submit to the President of the United States from time to time certain reports, and there are scores of officials whose duty it is to submit to the Governor of the Commonwealth from time to time certain reports; but no one would contend that the chief executive of nation or state could be removed from office because he did not see to it that all such reports were made at exactly the time they were expected by law to be made. If a chief executive of a state or nation fails to give adequate supervision to the work of his subordinates, he is answerable for such delinquency to the bar of public opinion, but not to a court of impeachment.

It is not necessary to discuss the respondents' defence-in-fact to this charge. They could have demurred to this charge without answering it and the demurrer would have been sustained.

*Second alleged breach of duty.*

The charge is that the directors neglected to require the tax collector to pay the full amount of school taxes collected during the month to the treasurer of the district, in violation of section 553 of the Code. Again, we turn to the Code and we find neither in said section nor elsewhere a word commanding the directors to compel the collector to pay at the end of each month the full amount of taxes collected to the treasurer. True, the collector is commanded to do so, just as the Collector of Internal Revenue of the United States is commanded to turn over his collections to the United States Treasurer. If the collector of school taxes of the City of Scranton School District or the Collector of Internal Revenue of the United States beguiles his superiors into the belief that he is discharging this duty faithfully, his superiors are not removable from office because they permitted themselves to be thus beguiled. Every superior officer in the land is expected to exercise a certain amount of supervision over his subordinates, just as the commander-in-chief of an army is expected to do so; but for such neglect of duty no superior officer is remov-

able by impeachment or by process akin to impeachment. The bar of public opinion is the bar where public officials, from President down, who trust too much to their subordinates, must be arraigned, and election day is for them the "day of judgment." President Grant's secretary of war was impeached and forced out of office for his delinquencies, but no one contended that the President himself was subject to impeachment and removal because he did not discover and put an end to his subordinate's delinquencies. Benedict Arnold, if captured, would have been hanged for his treason in betraying his country, but no one ever contended that George Washington should have been tried for treason or even removed from office for trusting and appointing Arnold to a high military post and for not discovering his treason earlier. The directors may be held negligent by their masters, the people, in not discovering that the tax collector was holding public moneys in the bank for a few months and personally drawing interest thereon instead of turning this money over to the treasurer promptly; yet it is easy to understand how even vigilant directors could have been imposed upon by a system such as used here, whereby the treasurer receipted to the collector for the taxes and the latter turned his checks over to the treasurer, though in fact the treasurer did not cash the checks for several months later, thereby giving the collector personally the use of the public funds for several months to his own personal profit.

But here, again, the neglect of duty charged against the directors is not a neglect of duty such as to them is made mandatory by the Code.

The answer of the respondent directors to charge two need not be discussed, for said charge sets forth no offence which, under the law, gives us any authority to remove the directors, and a demurrer to charge two would have been sustained.

*Third, fourth, fifth, sixth, seventh and eighth alleged breaches of duty.*

The third charge is that the directors, at the regular meeting for the election of officers for the year 1919, reappointed and authorized S. C. Gernon, tax collector, to collect taxes for the succeeding year, without the said S. C. Gernon having first settled his duplicate in full with the board of school directors for the year 1918-1919, in violation of section 560 of the Code.

Charge four makes similar complaint of Gernon's reappointment for the year 1920.

Charge five makes similar complaint of Gernon's reappointment for the year 1921.

Charge six makes similar complaint of Gernon's reappointment for the year 1922.

Charge seven makes similar complaint of Gernon's reappointment for the year 1923.

Charge eight makes similar complaint of Gernon's reappointment for the year 1924.

Section 560 of the School Code of 1911 reads as follows: "In all school districts of the second, third and fourth class, no tax collector shall be reappointed, or be authorized to collect any school taxes in any school year, unless he shall have first settled his duplicate in full with the board of school directors for the preceding year in the manner herein provided."

"The manner herein provided" refers to section 559 of the School Code, which sets forth: "In every school district of the second, third or fourth class, every collector of school taxes shall proceed to collect the taxes set forth in the duplicates furnished to him, and pay the same over at least once

every month, and every such collector of school taxes shall fully account for and pay over to the treasurer of the school district in which he is appointed or elected the total amount of school taxes appearing upon the tax duplicates furnished to him, on or before the first day of June each year, *less such amount as he may be exonerated from by the board of school directors, and also less such amount of unpaid taxes as is assessed and levied upon real property in said school district upon which there is no personal property out of which said school taxes might have been or could have been collected.*"

There is no disagreement as to what actually took place preceding the reappointment of S. C. Gernon as tax collector during the years above referred to. The facts are these: At the end of each year the tax collector presented to the board of school directors a written statement of his account, showing the amount of the duplicate, together with all additions thereto, the amount collected and the amount of the duplicate uncollected. The amount uncollected was divided into uncollected personal taxes and uncollected property taxes. Accompanying this letter there was a statement, signed by Edward Eisele, accountant for the board, verifying the correctness of the tax collector's statement according to the books of the tax collector. Further accompanying the letter from the tax collector there was a complete list or statement of exonerations claimed by the tax collector, giving by wards the duplicate number, the name, the amount and the penalty of each personal tax from the collection of which the collector wished to be released, and also a list of property taxes, giving in the same way, by wards, the duplicate number, the name, the amount and the penalty of the tax in question, accompanied by an affidavit by the tax collector to the effect that, after proper efforts, he could not find sufficient personal property out of which such property tax or any part thereof could be made or collected as provided by law.

Prior to making the foregoing statement to the board, the tax collector had endeavored to collect the tax by written notice mailed to each taxable, and by advertisement in the newspaper, that the penalty upon the tax was about to become due, and, later, that he was about to place the delinquent taxes in the hands of an alderman for collection, and, finally, by actually placing the taxes in the hands of an alderman for collection, after which the alderman made his own efforts to collect said taxes. After these efforts had failed, the items in the tax collector's books which the tax collector had been unable to collect were copied on either the list of exonerations claimed or the list of unpaid property taxes. Upon due report of this being made to the board, the board, apparently believing that the collector had done everything that could reasonably be expected of him to enforce payment of the taxes, did in fact, each year before the collector was reappointed, accept the settlement proposed by the tax collector, and did, in fact, release him from the further collection of the taxes appearing upon the list of exonerations claimed and the list of unpaid property taxes, taking in each case a bond in the sum of five or ten thousand dollars to protect the district from loss because of any irregularity or mistake in the collector's return. The practice of taking such a bond from the tax collector dates back at least six or eight years. In certain instances, the resolution was that the bond should be in the name of the district, in others that it should be taken in the name of the directors, and in one case that it should be for the protection of the school district and board members.

This settlement with the collector, however, did not mean the abandonment of efforts to collect the taxes which the collector had declared his inability to collect. In the case of unpaid property taxes, suits were instituted in the name of the district, and if these did not result in payment of the taxes in

question, liens were filed against the various properties, as a result of which a large part of the property taxes from the collection of which the tax collector was released has been in fact collected or is in process of collection. In the case of personal taxes, collection subsequent to settlement with the tax collector was effected in many instances and the money turned over by the alderman in whose hands the collection of delinquent taxes had been placed. These taxes so collected by the alderman were turned over to the treasurer and accounted for as cash and entered in the cash-book by the clerks in the tax collector's office.

Counsel for the petitioners argue that the granting of exonerations is governed by section 31 of the Act of May 8, 1854, P. L. 617. As a matter of fact, it appears on page 440 of the Pamphlet Laws for 1911, at the end of the School Code of 1911, that said Act of May 8, 1854, P. L. 617, is among those acts which the School Code declares, on pages 448 and 461, are "hereby repealed." The School Code of 1911 lays down no rule governing the matter of granting exonerations, except to recognize the right of the board to grant exonerations, by the provision of section 559 of the Code, to the effect that. the tax collector must settle for the full amount of his duplicate, less "such amount as he may be exonerated from by the board of school directors." This section recognizes the power of the school directors to release or exonerate the tax collector himself from the duty or responsibility of collecting all the taxes in the duplicate.

It will be observed that the action of the school board in exonerating the collector from the collection of certain taxes did not purport to exonerate any individuals from the payment of taxes; and we do not think it is necessary for us to determine in this decision the power and the extent of the power of the school directors to grant exonerations to individual taxpayers. However, the right of the taxing powers to exonerate taxpayers was a common law right and has been expressly recognized by various decisions of our appellate courts.

Black v. Duquesne Borough School District, 239 Pa. 96, holds that sections 559 and 560 of the School Code do not require the collector to pay to the treasurer the full amount of the duplicate; that he is to pay such amount, less exonerations to which he may be entitled, and that the exonerations are to be determined by the board of directors.

Com. v. Brown, 40 Pa. C. C. Reps. 201, 209: "The thing required of a collector by the section under consideration, before receiving a new duplicate, is that he shall settle for the old one. He shall first settle the old one in the manner provided by the act; that is, by paying the total amount thereof, less exonerations, to the district treasurer. Every good purpose intended by the section will be conserved by giving to it this construction."

Dunmore Borough v. Dempsey, 280 Pa. 190, 193: "The right of a borough council to grant exonerations from liability for certain taxes is recognized in the Act of June 25, 1885, P. L. 187, and settled by the case of Jones v. Sharon Borough, 238 Pa. 35, 41."

There is no doubt of the fact that the tax collector was actually released, that is, exonerated, from the responsibility of collecting those taxes which he declared in his sworn statement to the board that he had been unable to collect after making diligent efforts to do so. The word "exonerate" literally means to take off the burden, and though the school directors in their resolution did not use the word "exonerate," but did use the word "release," there is not sufficient distinction between the word "exonerate" and the word "release," as used in this connection, to give to the use of the word "release"

any significance in this case. By releasing or exonerating Gernon from the collection of certain taxes on his duplicate, all the other taxes having been paid, the board of school directors actually put Gernon in position to settle his duplicate in full with the board of school directors for the preceding year, and this certainly made him *prima facie* eligible for reappointment.

It is probable that no tax collector has ever collected all the taxes set forth in the duplicates furnished to him, and to hold that a school board has not wide discretion in exonerating a collector from the collection of taxes in the duplicate by the end of the school year would be equivalent to holding that no school tax collector can ever be reappointed to succeed himself. If the framers of the Code had been of the opinion that no school tax collector should ever succeed himself, it would have been very easy to have inserted in the Code a provision making a school tax collector ineligible to reappointment. While there might be some arguments in favor of this ineligibility, there are also many arguments against it, as the experience the tax collector gains during his incumbency in office should naturally make for his efficiency during succeeding terms.

Before we could convict the board of directors of violating section 560 of the Code, we would have to find that the board and the collector entered into a conspiracy to violate the spirit and purpose of that section. To convict of conspiracy requires strong evidence, and such evidence is wanting in this record. It is apparent that the board reposed great confidence in the collector and wished to retain him in office, and were liberal in releasing or exonerating the collector from the burden of collecting all the taxes in his duplicate; but it is equally apparent that no loss thereby accrued to the School District of the City of Scranton, and that, though the tax collector himself was released or exonerated, the liability of the taxable to pay his taxes was not thereby affected. While the collector was relieved of his responsibility of collecting these delinquent taxes, efforts were afterwards made by other agencies and methods to collect the same, and these efforts were quite largely successful.

To justify the demand of the petitioners for the removal of the board, the law would have to read this way: "No tax collector shall be reappointed until he shall have first settled his duplicate in full for the current year, and no settlement will be deemed a settlement in full except a settlement based upon the collection of all taxes set forth in the collector's duplicate, less such amount as the individual taxpayers may have been exonerated by the board from paying, and these exonerations shall be based only on mistakes, indigent persons and unseated land, and such exonerations shall be of no legal validity or effect unless the board of directors personally investigate the merits of every such exoneration asked for, either by the taxpayer or by the tax collector."

There is, of course, no such drastic provision in the law; and if there was, it would be impossible to find a board of directors in any district of the first or second class to comply with such a provision requiring a personal investigation by them of the thousands or tens of thousands of individuals exonerations claimed either by the taxpayer or by the collector. The law simply says that the collector shall settle his duplicate by paying over to the board the amount of such duplicate, less such amount as he may be exonerated from by the board of directors. That is equivalent to saying that a man shall pay the debts charged against him, less such amount as he may be released from paying.

The word "exonerate" is given its literal meaning by Bouvier's Law Dictionary, "Exoneration: The taking off a burden or duty." When the board

of school directors "took off" from S. C. Gernon the "burden or duty" of collecting certain taxes charged against him in the duplicate and appointed other agencies to collect these taxes, and when Gernon had paid over to the board the total amount of taxes charged against him, less those taxes from whose collection he had been released or exonerated, his account with the board, was squared and his duplicate had been settled in full, and he was eligible for reappointment.

Whether the board acted wisely or not in releasing Gernon from the duty of collecting these delinquent taxes and appointing other agents to make such collections is not for us to say in these proceedings. That is a matter entirely within the board's discretion. It is too clear to require argument that when Gernon was made tax collector each year, he was eligible to reappointment, his duplicate having been settled in full. If an attack on his title to the office of tax collector had been raised in *quo warranto* proceedings by an averment of his ineligibility to reappointment during any of the years he held the office, the minutes of the board, showing his release from the collection of part of the taxes and his paying over all taxes for the current year, from whose collection he had not been released, would have been a complete answer to such proceeding.

Gernon's eligibility to reappointment being established, the board violated no mandatory provision of the Code in reappointing him tax collector during any of the years mentioned, and these charges, three to eight, inclusive, must fall.

## Ninth alleged breach of duty.

This charges that the directors granted illegal exonerations of taxes without giving any consideration to the names and excuses set forth in the statement of exonerations claimed by the tax collector, and that such exonerations could be legally granted only for two specific reasons, to wit: Abatement or allowance for mistakes or indigent persons.

This charge is predicated upon the fact that when the tax collector submitted to the board each year a list of taxables from whom taxes could not be collected, the reasons assigned for the inability to collect these taxes were frequently untrue, such as, for instance, listing a well-known resident of the city as being absent from the city, or listing a well-known adult taxpayer as not being of age, etc. It appears from the testimony that these notations were made in the tax collector's office by the clerks in the office, at the collector's direction, or at least with his knowledge and consent. However, these untrue and at times picturesque designations had a great deal more value as newspaper copy than they have in determining the issues now before us. At most, they prove only a certain degree of carelessness on the collector's part in not collecting taxes promptly from well-known taxables, but in cold fact, not a cent's worth of taxes was lost to the school district because of these fictitious reasons. The taxes of those able to pay taxes were afterwards collected, and the only conviction that could be predicated upon these erroneous reasons would be a conviction of the tax collector on the charge of delayed collections in a few instances, for the total number of these fictitious reasons, compared to the whole number of taxables, was comparatively small. Furthermore, no matter what these fictitious reasons may convict the tax collector of, he is not now on trial before us. We are trying the board of school directors for violation of a mandatory duty imposed upon them by the School Code of 1911. There is not a word in the Code which commands the school directors to personally investigate the case of every delinquent taxpayer. There are thousands of names on these delinquent lists, and we believe that the law does not

even impliedly cast upon the members of the school board the burden to personally check up all these names. The law certainly does not expressly command them to do so, and no proceeding for the removal of school directors could be successfully founded upon the specification in charge No. 9. The last part of charge No. 9, stating that "the law requires careful and deliberate consideration of all exonerations from the payment of personal taxes, and such exonerations can be granted only for two specific reasons, to wit, abatement or allowance for mistake or indigent persons," is based upon the Act of 1854, which, as we have pointed out above, was expressly repealed by the School Code of 1911.

*Tenth, eleventh, twelfth, thirteenth and fourteenth alleged breaches of duty.*

It is not necessary to dispose of the tenth, eleventh, twelfth, thirteenth and fourteenth charges set forth in the petition to remove the directors, as some of these charges are in part involved in the charges already disposed of in this case, and none of these charges were stressed in the case or in the briefs filed. They refer mainly to the alleged shortcomings of the tax collector and the failure of the board to make the tax collector certify to the secretary accurate descriptions of property against which taxes had been levied, etc., and failure to make the tax collector devote all his time to the discharge of his duties as tax collector. If the matters set forth in charges ten to fourteen were accepted as true, we cannot find, even after the most careful reading of the School Code, any mandatory provision therein which the acts charged constitute a violation of. As we said in our discussion of charges one and two, the board of school directors cannot be removed because of the shortcomings of one of their subordinates, any more than the President of the United States could be removed because of the shortcomings of a cabinet officer or head of a bureau.

*Fifteenth alleged breach of duty.*

This charges that the directors were negligent, in that they permitted the tax collector to collect and convert to his own use sums of money drawn as interest by him upon the funds of the Scranton School District deposited in various banks of the City of Scranton, such action being in violation of law and in conflict with a resolution adopted by the board.

There is no doubt that the tax collector was not entitled personally to any interest on school funds. In fact, if the law had been complied with, the taxes would not have been retained by the tax collector long enough even to have returned any interest. Section 566 of the Code provides that if the tax collector shall fail to pay the school funds to the proper school treasurer at such times as specified in the Code, such act shall be deemed an embezzlement. Section 559 declares that the collector shall pay the taxes collected by him over to the treasurer at least once a month. Section 566 further provides that if the tax collector shall convert to his own use in any way whatever, or shall use by way of investment any portion of the school funds collected by him, such act shall be deemed an embezzlement. Section 332 provides that if the treasurer shall receive for his own use any interest or profit on any school funds, or shall fail to account for and pay over to the proper school district any and all interest or profit collected by or paid to him on account of any school funds in his hands or deposited by him, then every such act shall be deemed an embezzlement

Nothing is clearer than that the Code attempted emphatically to provide against a cent of interest on public moneys ever going into private pockets. This provision of the Code was palpably evaded by the collector's failure, with the connivance of the treasurer, to turn over every month all taxes coming

Scranton City School Directors.

into his hands. Even in the absence of any provision in the Code, there is no more warrant for a public official receiving to his own personal profit interest on public funds than there is for any other kind of trustee to put into his private pocket interest on funds of which he is trustee. The natural increase of money, like the natural increase of livestock, belongs to the owner of it, not to the mere custodian of it.

But the petitioners have failed to offer any evidence that the directors knew of the arrangement whereby the tax collector was personally profiting by receiving to himself interest on deposits of taxes. The directors may be justly subject to some public censure because they did not take steps to ascertain whether or not the collector was personally profiting by receiving interest on public funds, when such charges were openly made in May, 1924. But they cannot be removed from office because of their apparent lack of mental reaction to the charges then made against one of their subordinates. There have also been intimations that some of the directors long ago had knowledge of the arrangement between the treasurer and the collector to at least the latter's personal profit; but no one can be convicted in penal proceedings on mere intimation. There are undoubtedly several directors on the board who did not have the slightest suspicion that the collector was personally receiving interest on public funds. There is nowhere in the Code any provision empowering us to remove the school board or any of them because they were not vigilant enough to discover, and energetic enough to stop, the personal appropriation by their subordinates of interest on public moneys.

### Sixteenth alleged breach of duty.

This charges that the directors neglected and failed to require W. C. Williams, treasurer of the school district, to make a report at the end of each month to the secretary of the board of the amount of money received and disbursed by him during said month, in direct violation of section 325 of the School Code.

The evidence shows that the treasurer did make reports to the directors from time to time of the amounts of money received and disbursed by him. Even though he failed to make these reports at the end of each month, this was a breach of duty on his part, not a breach of duty on the part of the school board; and what we have said in discussing the second alleged breach of duty as to the failure of the board to require the tax collector to perform certain duties monthly applies to the alleged failure of the board to require the treasurer to perform his duties promptly at the end of each month during every month of the school year.

There is nothing in the Code that would permit us to remove the school directors because the school treasurer (who, as we have already pointed out, is not even a member of the board) did not comply literally with the provisions of the School Code.

### Seventeenth alleged breach of duty.

This charges that the board negligently permitted the school treasurer to have full and absolute control of all school funds in his possession and deposit the same other than in the name of the school district.

This contention, even if true, would not warrant the removal of the board. We have failed to discover any evidence in support of this contention. The school law gives to the bonded treasurer of the school district full and absolute official control over all funds in his possession. So far as from the evidence appears, all deposits of the school treasurer were made in the name of the school district.

*Eighteenth alleged breach of duty.*

This charges that the directors were negligent in permitting the school treasurer to draw upon the school funds in other ways than by regular school order, authorized by the board and signed by the president and secretary of the board of school directors.

The School Code does not require the school treasurer to draw upon school funds by a regular school order, authorized by the board and signed by the president and secretary. The school law requires that the treasurer shall draw upon school funds when they have been deposited by him in a bank in the name of the school district by his check as treasurer of the school district, and that he shall draw such check when he receives a regular school order, authorized by the board of school directors and signed by the president and secretary of the board. Such order constitutes the authority to the treasurer by the board for the payment of money. Thereupon the treasurer has a right to make the payment by his own check as treasurer without further order of the board. This he apparently did.

Furthermore, if the treasurer departed from this provision of the Code in any way, the violation of duty would be his, not the board's.

*Nineteenth alleged breach of duty.*

This charges that the school directors were negligent, in that they entered into contracts without the affirmative vote of a majority of all the members of the board of school directors being duly recorded as required by section 403 of the School Code.

This section provides that: "The affirmative vote of a majority of all the members of the board of school directors in every school district in this Commonwealth, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects," enumerating said subjects.

We regard this provision as mandatory upon the board, as the minutes are within the control of the board and do not become official minutes of the board until duly adopted by the board. However, the violations charged and proved here were more technical than substantial. It appears from the minutes that the board entered into certain contracts for the payment of small sums of money upon motions duly made and duly seconded and marked carried, but without showing how each member voted.

The inference from the minutes is that the vote was unanimous, and that, therefore, every member present voted in favor of the motion. If these technical violations of the mandatory provisions of the Code had resulted in any loss to the school district, or if they were of a substantial character, the removal of the board might be justified; but the violations are of such an unsubstantial and technical character and so harmless in results that no court would be justified on these grounds alone in taking the drastic action asked for in the case at bar. In fact, nowhere in the entire proceeding have the petitioners stressed or urged upon us these violations of the mandatory provisions of the Code. The emphasis of the petitioners has been placed upon the third, fourth, fifth, sixth, seventh and eighth alleged breaches of duty, which we have above discussed at length, and also upon the first, second and sixteenth alleged breaches of duty, which, as we have pointed out, were not breaches of duty on the part of the board, but breaches of duty on the part of the tax collector and treasurer, who have a legal status distinct from that of the board, and whose duties are specifically defined and distinguished from the duties of the board itself.

### Other alleged breaches of duty.

We do not deem it necessary to discuss the remaining alleged breaches of duty. They refer to alleged breaches of duty on the part of the tax collector, and to the alleged failure of the board to attend to certain details which are nowhere in the Code made mandatory upon the board to attend to, and more particularly, they refer to certain alleged breaches of duty on the part of the secretary of the board, who, like the treasurer and the tax collector, is a dis-- tinct official and has distinct legal duties to perform.

Even if these breaches of duty charged against the tax collector and secretary were fully proved, they would not constitute a breach of a mandatory duty on the part of the school directors, and, therefore, these charges would not empower us to remove the board of directors and are properly demurrable.

### Conclusion.

Practically all the charges made by the petitioners can be summed up into a general charge that the board of school directors was lax and incompetent in the management of the affairs of the school district, and because of this laxity and incompetence public moneys were stolen. It is such a charge as the "outs" in a political campaign usually make against the "ins"—a charge almost precisely similar to those made in the recent campaign against the present national administration. It is a proper charge to be considered and discussed when officials ask a vote of confidence from the electorate, but it is not such a charge as has ever been entertained before any impeachment court. Charges made as the basis for the legal removal of public officials from office must be formulated with the precision of indictments in the criminal courts, and must be sustained by definite evidence of so convincing a character as to leave practically no substantial doubt of the truth of the charges. This burden the petitioners have not met in the case at bar.

The Court of Common Pleas cannot remove the directors because one of their long-trusted employees embezzled a quarter of a million dollars, any more than the Senate of the United States could have removed a recent President because of the alleged delinquencies of one of the members of his cabinet. When the public have been wronged, it naturally and properly demands the punishment of the person committing the wrong; it also naturally wishes to visit vengeance on those whose carelessness or lack of supervision made possible the commission of the wrong. Sometimes, however, under the guise of seeking justice, certain persons seek only victims. When the Greek Army was overwhelmed at Smyrna a few years ago, the Greeks of the capital lined up the Prime Minister and his cabinet against a stone wall and shot them all. This is a very effective method of getting rid of alleged incompetent public servants, but it dose not comport with the American idea of a square deal. Had Alexander the Great been resurrected long enough to have been the Greek Prime Minister during the latest Turco-Grecian conflict, the Turks would probably still have overwhelmed the Greeks in Asia Minor just as decisively as they did; and had some of those critics who now with admirable hindsight are relating how they would have prevented the school district treasurer's defalcation been on the school board during the past eight years, they would probably have trusted Williams just as implicitly as did those directors who, since the disclosure of Williams's defalcation, have been daily facing, not one, but many verbal and vociferous "firing squads." Williams was able to hide his shortages since 1915 from the eighteen different auditors who have since that date been appointed by the court to specifically examine into his accounts and his bank balances. It is not surprising, therefore, that

he was able to hide his shortage from the various members of the school board during that period; and he would probably have been just as successful in hiding shortages from those who are now loudly demanding the directors' removal. Even in first-class banking institutions and other financial establishments shortages are often concealed for a considerable period from examiners and others who are specially trained in checking up accounts and discovering shortages, when such exist.

In view of the present great public interest in the affairs of the Scranton School District, it might be pertinent here to state that it is too much to expect busy men and women to give to the affairs of a large school district, such as that of Scranton, all the time and attention those affairs actually require without receiving a cent of salary. There is no more reason why the members of the Scranton School Board should serve without pay than there is why the members of the President's cabinet, or of Congress, or of the city council, should serve without pay. This does not excuse any man or woman who takes on himself or herself the responsibility of school directorship from discharging their duties faithfully; but the office of school director of a district of the size of Scranton ought to be so remunerative that those who become directors of such a district could afford to devote practically their entire time to the discharge of their duties. If the directors were paid a proper salary the public could justly demand of the directors exclusive or almost exclusive attention to the public duties resting upon them. People get about what they pay for, and when they pay nothing they cannot expect the same painstaking attention to detail as is justly expected from those who in public or in private life hold responsible positions with salaries commensurate with their responsibilities.

This consideration, however, would not deter us from removing the Scranton school directors if the evidence convinced us that they had violated the duties the law commanded them to perform and if the violation of these duties had resulted in grave loss to the district, but we will not "by strong arm" remove the directors because a long-trusted employee embezzled a quarter of a million dollars from the school district. In every organization, whether that organization administers a school district or a newspaper, a city or a hospital, a bank or a railroad, a district attorney's office or a department store, great trust and confidence must necessarily be reposed in subordinates. No head of such an organization would wish to be held personally responsible in penal proceedings for every possible act of any of his subordinates. No man or men at the head of an organization can supervise completely the work of every subordinate and check up every detail of the business. The public has no right to expect such perfect supervision and such perfect attention to details from men and women who are chosen for an unremunerative job from the busy walks of life and who must depend for their bread and butter upon following their usual vocations.

The School District of the City of Scranton is a great organization, handling through the years millions of dollars of public funds. In the fiscal year of 1922, for example, the school district collected and disbursed taxes amounting to $1,738,288.31, and the proceeds of bonds and other receipts amounting to $1,410,966.62, or a total budget of $3,149,254.93. This was a larger volume of business than was transacted by many organizations which had at their head high-salaried executives. The Scranton School District maintains seventy-two school buildings, employs 803 teachers and supervisors, and looks after the educational and physical welfare of 29,000 pupils. New building operations and repairs are constantly going on. Buildings and grounds must

be continually maintained. The members of the school board must serve on an educational committee, a medical committee, a physical educational committee, a mine cave committee, a building committee, finance committee, teachers' retirement committee and others. There are at least two regular meetings of the board of school directors held monthly, and several special meetings of the board or of the committees held either weekly or several times each week. There are also numerous visits to be made to the public schools. It is, indeed, a matter of some wonder that busy men and women can be found to take upon themselves the arduous duties of school directors in a district of the size of Scranton, with no reward in prospect except the reward that may arise from the consciousness of public service well performed.

It is certainly not to be expected that every member of a board of school directors of a district of the size of Scranton will master every detail of every department of the school district. For example, Mrs. Edwin Gearhart, the only woman member of the board, does not serve on the Finance Committee, but is chairman of the Committee on Physical Education, and is now serving, or has served, on the Mine Cave Committee, the Medical Committee and the Teachers' Retirement Fund Committee. It is due to Mrs. Gearhart to say that she has discharged her duties as school director with integrity and entire fidelity, and with ability and industry. In view, not only of the charges formally made in the present proceedings against the directors, but particularly of the charges irresponsibly made here and there in the public forum during the past six months, we deem it only an act of justice to say not only of Mrs. Gearhart, but of all the other members of the board, Messrs. Atherton, Bruning, Carson, Jones, Magovern, Rodham, Shoemaker and Williams, that nothing has been disclosed in the present proceedings which warrants any aspersion on their integrity or on their desire and intent to protect the great interests entrusted to them and to promote the welfare of the school children of the City of Scranton.

### Order.

Now, to wit, Nov. 25, 1924, the rule to show cause why the school directors of the School District of the City of Scranton should not be removed from office is discharged, and the petition for their removal is denied. As the petitioners in the proceeding acted apparently in what they deemed to be the public interests, the costs will not be imposed upon them, but will be imposed upon the School District of the City of Scranton. No witness bills on either side shall be included in said costs, except by special order of the court.

From William A. Wilcox, Scranton, Pa.